ACCEPTED
08-24-00220-CV
EIGHTH COURT OF APPEALS
EL PASO, TEXAS
10/31/2024 9:42 AM
ELIZABETH G. FLORES
CLERK

**No. 08-24-00220-CV**

FILED IN
8th COURT OF APPEALS
EL PASO, TEXAS
10/31/2024 9:42:27 AM
ELIZABETH G. FLORES
Clerk

IN THE COURT OF APPEALS
FOR THE EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

VANESSA VELEZ LABRADO,

*Appellant*,

v.

LEITH LABRADO and LABOE LABRADO,

*Appellees*.

**BRIEF OF APPELLANT**

Rachel Moreno
rachel.moreno@kempsmith.com
State Bar No. 24078321
KEMP SMITH LLP
221 N. Kansas, Suite 1700
El Paso, Texas 79901
Telephone: (915) 533-4424
Facsimile: (915) 546-5360

Attorneys for Appellant

**ORAL ARGUMENT NOT REQUESTED**

44Z3116 - 2/15/2024 11:51 AM

# IDENTITY OF PARTIES, COUNSEL, AND TRIAL JUDGES

Pursuant to TEX. R. APP. P. 38.1(a) and 8TH TEX. APP. (EL PASO) LOC. R. 3, Appellant certifies that the following is a complete list of all parties to this litigation, the names and addresses of all counsel, and a listing of all trial judges presiding.

| Party | Appellate Counsel | Trial Counsel |
|---|---|---|
| Vanessa Velez Labrado<br><br>**(Appellant and Defendant below)** | Rachel C. Moreno<br>Kemp Smith LLP<br>221 N. Kansas<br>Suite 1700<br>El Paso, Texas 79901<br>(915) 533-4424 | Doris Sipes<br>310 N. Mesa, Suite 400<br>El Paso, Texas 79901<br>(915) 544-5235<br>doris@dorissipes.com |
| Leith Labrado | Troy C. Brown<br>1074 Country Club Rd.<br>Suite B-4<br>El Paso, Texas 79932<br>troy@tcblegal.com | Troy C. Brown<br>1074 Country Club Rd.<br>Suite B-4<br>El Paso, Texas 79932<br>troy@tcblegal.com |
| Laboe Labrado<br><br>**(Appellees and Defendants below)** | Laura Enriquez<br>Laura Enriquez and<br>  Associates, PLLC<br>221 N. Kansas, Suite 710<br>El Paso, TX 79901<br>enriquez@leeplaw.com | Laura Enriquez<br>Laura Enriquez and<br>  Associates, PLLC<br>221 N. Kansas, Suite 710<br>El Paso, TX 79901<br>enriquez@leeplaw.com |

**Trial Judge Presiding:** The Honorable Selena Solis
Judge Presiding in the 243rdth Judicial District Court of El Paso County, Texas

**TABLE OF CONTENTS**

Page

IDENTITY OF PARTIES, COUNSEL, AND TRIAL JUDGES ............................ i

TABLE OF CONTENTS ................................................................................. iii

INDEX OF AUTHORITIES ............................................................................. iv

RECORD REFERENCES ............................................................................... vii

STATEMENT OF THE CASE ........................................................................ viii

STATEMENT OF JURISDICTION ................................................................. xi

STATEMENT ON ORAL ARGUMENT ......................................................... xii

ISSUES PRESENTED .................................................................................... xiii

STATEMENT OF FACTS ................................................................................ 1

    I.      Introduction. ....................................................................................... 1

    II.     The Initial Outcry and CPS Investigation. ....................................... 3

    III.   The Temporary Restraining Order and the Protective Orders ........... 11

    IV.   The March Outcry .............................................................................. 14

    V.    The April Outcry ............................................................................... 15

    VI.   The Daycare Investigation ................................................................ 17

SUMMARY OF THE ARGUMENT ................................................................ 19

ARGUMENT ................................................................................................... 22

    I.      Standards of Review .......................................................................... 22

    II.     Vanessa conclusively proved her defenses of absolute immunity through the judicial-proceedings privilege and statutory immunity under Section 261.106 of the Texas Family Code. ........................... 23

    III.   The evidence was legally insufficient to support the jury's finding of

liability against Vanessa for malicious prosecution of a civil claim and the trial court erred as a matter of law entering judgment against Vanessa based on that erroneous verdict. ............................................34

IV.    The evidence was legally insufficient to support the jury's finding of liability against Vanessa for abuse of process and the trial court erred as a matter of law entering judgment against Vanessa based on that erroneous verdict. ...............................................................................43

V.    There is legally insufficient evidence in the trial record to support the jury's answers regarding damages. .....................................................48

PRAYER .............................................................................................................55

CERTIFICATE OF COMPLIANCE .....................................................................56

CERTIFICATE OF SERVICE ............................................................................56

APPENDIX ........................................................................................................57

Verdict [CR 2463-2478] ........................................................... A-1

Final Judgment [CR 2585-2587] ................................................. A-2

iii

# INDEX OF AUTHORITIES

Page

**Cases**

*Airgas-Sw., Inc. v. IWS Gas & Supply of Tex., Ltd.*, 390 S.W.3d 472
(Tex. App.—Houston [1st Dist.] 2012, pet. denied)............................... 40, 41, 42

*Alvarez v. Anesthesiology Assoc.*, 967 S.W.2d 871
(Tex. App.—Corpus Christi-Edinburg 1998, pet. denied)...................................37

*Aransas Harbor Terminal R.R. Comm'n v. Taber*, 235 S.W. 841
(Tex. Comm'n App. 1921).................................................................26

*Arcides v. Rojas*, 677 S.W.3d 154
(Tex. App.—El Paso 2023, no pet.) ..................................................23

*Bennett v. Grant*, 525 S.W.3d 642 (Tex. 2017)........................................49

*Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002) ............................ 50, 53, 54

*Bird v. W.C.W.*, 868 S.W.2d 767 (Tex. 1994) ................................... 25, 28

*Blanton v. Morgan*, 681 S.W.2d 876
(Tex. App.—El Paso 1984, writ ref'd n.r.e.)................................... 41, 44

*Briscoe v. LaHue*, 460 U.S. 325 (1983)................................................25

*Butler v. Morgan,* 590 S.W.2d 543
(Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) ..................... 40, 41

*Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477 (Tex. 2015) ..................................25

*Chaney v. Corona*, 103 S.W.3d 608
(Tex. App.—San Antonio 2003, pet. denied).................................. 30, 31, 32, 33

*City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005)) .........................................23

*Detenbeck v. Koester*, 886 S.W.2d 477
(Tex. App.—Houston [1st Dist.] 1994, no writ)....................................47

*E. Tex. Educ. Ins. Ass'n v. Ramirez*, 631 S.W.3d 908
(Tex. App.—El Paso 2021, pet. denied).........................................................23

*Gonzalez v. Avalos*, 866 S.W.2d 346
(Tex. App.—El Paso 1993, writ dism'd w.o.j.) ...................................26

*Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261 (Tex. 2014))........................23

*Graves v. Evangelista-Ysasaga*, No. 14-22-00137-CV, 2023 WL 370589
(Tex. App.—Houston [14th Dist.] 2023, pet. denied)...........................45

*Gregory v. Chohan*, 670 S.W.3d 546, 563-64 (Tex. 2023) ............................ 50, 54

*Howard v. White*, No. 05-01-01036-CV, 2002 WL 1470071
(Tex. App.—Dallas Jul. 10, 2002, no pet.) .......................................37

*In re R.A.*, 346 S.W.3d 691 (Tex. App.—El Paso 2009, no pet.).....................27, 36

*James v. Brown*, 637 S.W.2d 914 (Tex. 1982) .........................................26

*Johnson v. State Bd. of Morticians*, 288 S.W.2d 214
(Tex. App.—Galveston 1956, no writ).............................................35

*Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40 (Tex. 2021) .... 25, 26, 28

*Laub v. Pesikoff*, 979 S.W.2d 686
(Tex. App.—Houston [1st Dist.] 1998, pet. denied)..............................25

*Martin v. Tex. Dep't of Protective and Reg. Svcs.*, 405 F.Supp.2d 775
(S.D. Tex. 2005) ................................................................ 27, 36

*Martinez v. English*, 267 S.W.3d 521
(Tex. App.—Austin 2008, pet. denied)........................................... 45, 47

*Montemayor v. Ortiz*, 208 S.W.3d 627
(Tex. App.—Corpus Christi 2006, pet. denied) ................................. 47, 48

*Pye v. Cardwell*, 222 S.W. 153 (Tex. 1920)..........................................40

*Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909 (Tex. 1942) ........................26

*Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607 (Tex. 1996)...........50

*Salado Coll v. Davis*, 47 Tex. 131, 136 (1877) ......................................42

*Sanders Oil & Gas, Ltd. v. Big Lake Kay Constr., Inc.*, 554 S.W.3d 79
(Tex. App.—El Paso 2018, no pet.) ...............................................23

*Service Corp. Intern. v. Guerra*, 348 S.W.3d 221 (Tex. 2011) ........................ 49, 53

*Sharif-Munir-Davidson Dev. Corp. v. Bell,* 788 S.W.2d 427
    (Tex.App.—Dallas 1990, writ denied) ................................................40

*Spencer v. Overpeck*, 2017 WL 993093
    (Tex. App.—San Antonio Mar. 15, 2017, pet. denied) .........................46

*Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989) ...................................22

*Telthorster v. Tennell*, 92 S.W.3d 457 (Tex. 2002) .......................................... 31, 32

*Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203 (Tex. 1996) ............... 35, 38, 40, 41

*Tex. Dep't of Protective and Reg. Svcs. v. Mega Child Care, Inc.*,
    145 S.W.3d 170 (Tex. 2004) ...............................................................27

*Victoria Bank & Tr. Co. v. Brady*, 811 S.W.2d 931 (Tex. 1991) ...........................22

*Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781
    (Tex. App.—Austin 2017) ....................................................................44

**Statutes**

Tex. Fam. Code Ann. § 261.106 .................................................................... 24, 29

Tex. Fam. Code Ann. § 261.101 .................................................................... 29, 30

Tex. Hum. Res. Code Ann. § 40.002 ....................................................................26

**Rules**

Tex. R. App. P. 25.1 ................................................................................................x

Tex. R. Civ. P. 329b ............................................................................................. ix

# RECORD REFERENCES

The Clerk's Record consists of one volume. References are in the form of "CR [page]."

The Reporter's Record consists of fourteen volumes. References are in the form of "[Volume] RR [page]".

**STATEMENT OF THE CASE**

*Nature of the case*     This appeal concerns malicious prosecution and abuse of process claims brought by Leith Labrado (Leith) and his brother, Laboe Labrado (Laboe) (collectively, Appellees), against Leith's wife, Vanessa Velez Labrado (Vanessa).[1] Vanessa and Leith's then-six-year-old son, Lucca, made an outcry of abuse which allegedly occurred at the hands of Laboe's stepchildren.[2] The outcry was reported to Child Protective Investigations[3] (CPS), which initiated an investigation.[4]

Approximately three weeks after the initial outcry, Lucca made additional allegations regarding the abuse during a therapy session, namely that Leith and Laboe witnessed the abuse by Laboe's stepchildren and did nothing to protect or help Lucca and threatened him if he reported the abuse to anyone.[6] These additional allegations were incorporated into an affidavit in support of two applications for protective orders regarding Leith and Laboe.[7] According to Appellees, the affidavits in support of the application for temporary injunction and in the applications for protective orders contained various untrue statements which the divorce court relied upon in issuing

---

[1] CR 22-28.

[2] 10 RR 11-14.

[3] Child Protective Investigations is the entity formerly named Child Protective Services and is widely referred to in the record as "CPS." Accordingly, the term "CPS" is also used in this Brief.

[4] 9 RR 66.

[5] 9 RR 30-31, 37-43; 12 RR 57-58.

[6] 12 RR 77-79.

[7] 12 RR 77-99.

orders that prevented Leith and Laboe from having access to Lucca and Ella and prevented Leith from living at the marital residence.[8] The subsequent allegations against Laboe, who owns Three R's School, LLC (the Daycare), also necessitated an investigation by the daycare licensing arm of the Department of Family and Protective Services.[9] Leith and Laboe[10] sued Vanessa for malicious civil prosecution regarding the allegations made to CPS, and for abuse of process regarding the temporary restraining order and the subsequent protective orders. The Daycare was also named as a plaintiff in the trial court but is not a party to this appeal.

*Course of proceedings*  Appellees and the Daycare filed their petition on November 9, 2021.[11] The case went to a jury trial on January 26, 2024.[12] Ten of the twelve jury members returned a verdict in favor of Leith and Laboe on their respective claims for malicious prosecution and awarded mental anguish damages of $250,000 and $25,000, respectively.[13] The jury also returned a verdict in favor of Leith and Laboe on their respective claims for abuse of process and awarded actual damages of $500,000 and $25,000, respectively.[14] The jury did not find any liability against Vanessa for the claims made by the Daycare.[15] The jury likewise did not make a unanimous finding of exemplary damages.[16]

---

[8] *See* 8 RR 77-78.

[9] 14 RR 54.

[10] The underlying case contained a third plaintiff, Three R's School, LLC (the School), which did not obtain judgment in its favor at the trial court and is not a party to this appeal.

[11] CR 8.

[12] 6 RR 1.

[13] CR 2466-67.

[14] CR 2470-71.

[15] CR 2468, 2473.

[16] CR 2474-76.

*Trial court disposition*  The trial court entered judgment on April 11, 2024, based upon the jury's verdict.[17] The amount awarded to Leith in actual damages was $750,000, plus prejudgment interest, which totaled $904,390.60, plus postjudgment interest to accrue.[18] The amount awarded to Laboe was $50,000, plus prejudgment interest, which totaled $60,289.76, plus postjudgment interest to accrue.[19] Vanessa filed a motion for new trial on May 10, 2024,[20] which was overruled by operation of law on July 24, 2024. *See* Tex. R. Civ. P. 329b. This appeal followed.[21]

---

[17] CR 2586.

[18] CR 2585-86.

[19] CR 2586.

[20] CR 2599.

[21] CR 2635.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to consider this appeal of a final judgment under Tex. R. App. P. 25.1.

## STATEMENT ON ORAL ARGUMENT

Appellant believes this appeal involves straightforward matters of settled case law and oral argument is not necessary to decide the issues at hand. If, however, the Court feels otherwise and sets this matter for oral argument, Appellant would like the opportunity to participate.

# ISSUES PRESENTED

1. Vanessa conclusively proved her defenses of absolute immunity through the judicial-proceedings privilege and statutory immunity under Section 261.106 of the Texas Family Code.

2. The evidence was legally insufficient to support the jury's finding of liability against Vanessa for malicious prosecution of a civil claim and the trial court erred as a matter of law entering judgment against Vanessa based on that erroneous verdict.

3. The evidence was legally insufficient to support the jury's finding of liability against Vanessa for abuse of process and the trial court erred as a matter of law entering judgment against Vanessa based on that erroneous verdict.

4. There is legally insufficient evidence in the trial record to support the jury's answers regarding damages.

# STATEMENT OF FACTS

## I. Introduction.

The facts of this case revolve around two families: the Labrado family and the Velez family.[22] As a preliminary matter, introduction to the members of those families sets the scene of the events which later unfold.

Vanessa Velez Labrado (Vanessa or Appellant) is the mother of Lucca and Ella. Vanessa is the director and nurse practitioner for the Child Abuse Resource Education and Services clinic, also known as the CARES Clinic, for El Paso Children's Hospital.[23] She has a Master of Science degree in pediatric nurse-practitioner, a doctor of nursing practice, and a postdoctoral degree in forensic nursing.[24] Vanessa currently resides with her mother, Lourdes Velez (Lourdes), Lucca, and Ella, at Lourdes's residence.

Lucca is approximately four years older than Ella.[25] At all times pertinent to this case, he attended school at Loretto Academy.[26]

Richard Velez (Richard) is Lourdes's son and Vanessa's brother.[27] Richard previously resided in Chicago and would stay at Lourdes's home when visiting El

---

[22] Because many of the persons involved in this case have a common last name, Appellant's Brief refers to members of the Velez and/or Labrado families by their first names for purposes of clarity.

[23] 9 RR 25.

[24] 9 RR 26.

[25] 7 RR 97.

[26] 9 RR 31.

1

Paso.[28] He has since returned to El Paso to live and owns two local businesses, including a martial arts academy.[29]

Vanessa is married to Leith Labrado (Leith).[30] Until the allegations of abuse were made, Leith lived with Vanessa at the couple's jointly-owned residence (the Blacker residence). Leith is Lucca and Ella's father. Leith sells used clothing in El Paso.[31]

Leith's brother is Laboe Labrado (Laboe). Laboe owns and operates Three R's School, LLC (the Daycare),[32] a daycare center started by his parents.[33] Laboe was in a long-term relationship with Melissa Dozal, who has two children, Nahomy and Damian.[34] Nahomy and Damian are generally referred to between the Velez and Labrado families as Lucca and Ella's cousins (or occasionally stepcousins) and Laboe's children,[35] although they are not related by blood or marriage.[36] Nahomy and Damian are several years older than Lucca and Ella.[37]

---

[27] 10 RR 7.

[28] 10 RR 7.

[29] 10 RR 5.

[30] 7 RR 45.

[31] 7 RR 43.

[32] 7 RR 45.

[33] 7 RR 42.

[34] 7 RR 147.

[35] 7 RR 64.

[36] 7 RR 147.

[37] 7 RR 147.

44Z3116 - 2/15/2024 11:51 AM

## II.   The Initial Outcry and CPS Investigation.[38]

On Friday, November 8, 2019, six-year old Lucca was playing with his maternal uncle, Richard, who was in town visiting from Chicago.[39] Richard, who practices martial arts,[40] asked Lucca if he wanted to learn a new martial arts move.[41] Lucca declined and then became very upset.[42] The following day, Saturday, November 9, 2019, after Lucca attended practice for a golf tournament,[43] Richard took Lucca shopping for a video game while Vanessa attended a work event that evening.[44] During their time together, Richard asked Lucca why Lucca had gotten so upset the prior evening.[45] At that time, Lucca made an outcry of abuse (the Initial Outcry) to Richard regarding various actions by Damian and Nahomy.[46] After speaking with Lucca, Richard texted Vanessa and told her he needed to speak to her.[47] Vanessa left the work event and went to Lourdes's home

---

[38] The testimony at trial contains some discrepancies and/or misstatements of dates regarding the exact timeline of events. Appellant has endeavored to clarify any discrepancies based upon the documentary evidence in the trial exhibits.

[39] 9 RR 63.

[40] 10 RR 5.

[41] 9 RR 60.

[42] 9 RR 58.

[43] 9 RR 64.

[44] 9 RR 65, 69.

[45] 9 RR 65-66.

[46] 10 RR 11-14.

[47] 9 RR 65.

where Richard was staying and Lucca was spending the night.[48] Richard then told Vanessa about the Initial Outcry.[49]

Sunday, November 10, 2024, Lucca competed in a golf tournament.[50] Vanessa chose not to speak with Lucca about the Initial Outcry that day, and did not mention it to Leith.[51]

On Monday, November 11, 2024, while traveling with Vanessa to Walmart, Lucca asked Vanessa, "Has my nino [Richard] told you what I told him?"[52] Vanessa answered that Richard had not shared any information with her because Vanessa did not want Lucca to feel like Richard had broken Lucca's trust, and she also wanted to hear from Lucca in his own words.[53] Lucca then stated, "I have something to tell you, but I want nino to be there."[54] Richard met Vanessa and Lucca at a restaurant and discussed the substance of the Initial Outcry.[55] The discussion consisted of Vanessa asking questions, Richard giving information about what Lucca told him, and Lucca "chiming in."[56] Lucca also relayed to

---

[48] 9 RR 66.

[49] 9 RR 66.

[50] 9 RR 70.

[51] 9 RR 70, 72.

[52] 9 RR 70, 74.

[53] 9 RR 74-75.

[54] 9 RR 74.

[55] 9 RR 77.

[56] 9 RR 78.

4

Vanessa that he had told Leith about the substance of the Initial Outcry previously and Leith told him not to tell Vanessa or else he would "make [Lucca] pick up the dog poop for a year."[57]

Richard reported the Initial Outcry to CPS on November 11, 2019, after his discussion with Vanessa and Lucca,[58] and CPS opened an investigation on Tuesday, November 12, 2019.[59] The same day the CPS Investigation commenced, Vanessa sent Leith a text message notifying Leith that CPS had been called.[60] That afternoon, Leith and his business attorney, David Leffman (Leffman), arrived at Leith and Vanessa's home for the CPS interviews.[61] Leith and Leffman waited outside while the CPS investigator concluded her interview with Vanessa.[62] Following Vanessa's interview, Leith was interviewed.[63] He learned that the allegations in the CPS Investigation involved Nahomy and Damian twisting Lucca's arm behind his back and grabbing his genitals.[64] Thereafter, he was not told by CPS that he had to leave his house and he spent the night at the Blacker

---

[57] 9 RR 80.

[58] 9 RR 66.

[59] 13 RR 19 (Pls.' Ex. 17).

[60] 7 RR 70.

[61] 7 RR 71.

[62] 7 RR 72.

[63] 7 RR 73.

[64] 7 RR 74.

residence.[65]

Records of the CPS Investigation were admitted at trial as evidence.[66] Richard is listed as the Reporter.[67] Richard described the incident with the martial arts move on November 8.[68] He explained that Lucca had told him he got upset because he was worried Richard would hurt him while doing the move.[69] Richard said he apologized to Lucca and asked if there was someone else who hurt him, to which Lucca replied his cousins (Nahomy and Damian).[70] Lucca described that when he was at the Daycare working on homework, Damian would grab Lucca by his neck and arm and Nahomy would grab his other arm and twist it behind him.[71] Lucca also reported to Richard that Damian punched Lucca in the genitals and pulled and twisted his genitals hard on top of his clothing.[72] While this was happening, Nahomy put her hand over Lucca's mouth to prevent him from screaming, even though Lucca was crying and screaming for help.[73] Lucca said he ran to tell Leith about the incident but Laboe was with Leith and Lucca is scared of

---

[65] 7 RR 73.

[66] *See* 13 RR 1-183; 14 RR 5-74.

[67] 14 RR 10.

[68] 14 RR 10.

[69] 14 RR 10.

[70] 14 RR 10.

[71] 14 RR 10.

[72] 14 RR 10.

[73] 14 RR 10.

6

Laboe.[74] Lucca reported being scared of Laboe because Laboe pulled his hair while they were golfing and told Lucca to keep his head down.[75] According to Richard's report of Lucca's outcry, it hurt Lucca all day when his hair was brushed.[76] He also reported that his genitals are red and swollen and it hurts to sit down, pee, or shower.[77] According to Richard's report of the outcry, the incidents with his cousins have happened four to six times.[78] The other incidents were similar as the one reported in detail.[79] Lucca reported that multiple times, his genitals were grabbed over his clothes and it was painful.[80] Lucca denied any sexual contact or oral sex by his cousins in his account to Richard.[81]

When CPS interviewed Lucca about the Initial Outcry, Lucca's recounting of the Initial Outcry was largely as reported by Richard.[82] Lucca claimed he had never spoken about the incidents with his stepcousins with Leith, Laboe, or this stepcousins' mother, Melissa.[83] He stated that he is afraid of Laboe because he is

---

[74] 14 RR 10.

[75] 14 RR 10.

[76] 14 RR 10.

[77] 14 RR 10.

[78] 14 RR 10.

[79] 14 RR 10.

[80] 14 RR 10.

[81] 14 RR 10.

[82] 14 RR 18.

[83] 9 RR 81.

44Z3116 - 2/15/2024 11:51 AM

mean to him, pulls his hair, and hits him in the arm and the chest.[84] He also denied other inappropriate touching by any other person.[85] He stated that he liked that his dad is always silly, but stated a number of things he did not like about his dad, like how he cusses at him while playing golf, at home and the office, and sometimes "in the truck."[86] He reported that sometimes his dad would sneak up on him and push him off the couch for no reason other than "just to be mean to him."[87] When his mom has seen this happen, Lucca reported that she would take him and Ella to stay at Lourdes's house or his "nino's house."[88]

CPS interviewed numerous persons in their investigation, the totality of which is too voluminous to detail here. Interviews of Vanessa, Leith, and Lucca occurred at the Blacker residence on November 12, 2019. Vanessa reported to CPS that she had previously told Leith she did not want Lucca around Damian and Nahomy and believed Leith had agreed to keep them apart, but apparently Leith had still been taking him to the Daycare where they were.[89] Vanessa reported that Leith does sometimes cuss at Lucca and pushes him off the couch.[90]

---

[84] 14 RR 18.

[85] 9 RR 82.

[86] 14 RR 17.

[87] 14 RR 18.

[88] 14 RR 18.

[89] 14 RR 21.

[90] 14 RR 21.

44Z3116 - 2/15/2024 11:51 AM

When CPS investigators interviewed Leith, he laughed at the allegations made by Lucca in the outcry.[91] Leith denied the allegations and claimed he "always keeps his eye on his son when they are at the daycare."[92] He claimed the children were just wrestling and "it never gets to that extent."[93] He denied the extent of the allegations against Laboe about pulling Lucca's hair and telling him to keep his head down.[94] He denied ever pushing Lucca off the couch and admitted to cussing at Lucca the previous weekend but denied doing it regularly.[95]

On November 15, 2019, CPS filed an information report with the El Paso Police Department (EPPD) Crimes Against Children (CAC) unit.[96] The CPS investigator was informed by EPPD that the criminal elements for an investigation by the CAC were met because "if the child felt pain, then it's injury to a child[.]"[97] Thereafter, CPS was precluded from taking any further action in their investigation because they were required to defer to law enforcement to conduct any further witness interviews.[98]

The case was assigned to Detective Adriana Zamora with CAC on

---

[91] 14 RR 22.

[92] 14 RR 18.

[93] 14 RR 22.

[94] 14 RR 22.

[95] 14 RR 22.

[96] 14 RR 23-24.

[97] 14 RR 23.

[98] 14 RR 24; 8 RR 107-08.

November 21, 2019.[99]

On December 5, 2019, Lucca was interviewed by El Paso Police Officer Max Zimmerly with the CAC regarding the Initial Outcry.[100] CPS investigator Yvette Garcia took notes regarding the interview.[101] Garcia's notes state that Lucca

> reported his cousins pulled his pants down and laughed at him. Child reported his underwear were on when his pants were pulled off. Child reported his female cousin hurt his penis but did not make outcry of sexual abuse. Child reported he was afraid of his uncle but did not provide details as to why. Child reported he was afraid of father but did not provide details as to why.[102]

On December 5, 2019, the case was referred to the District Attorney's office.[103] The CPS investigator was informed "it was believed there was not enough evidence for a criminal case of injury to child or sexual abuse[, but] Detective said she would staff case with supervisor since child did say he was afraid[.]"[104] Interviews with the cousins, father and paternal uncle by the CAC were planned.[105]

On December 10, 2019, Detective Zamora called CPS and informed CPS that "child made another outcry [to Vanessa] that paternal uncle grabbed his

---

[99] 14 RR 25.

[100] 9 RR 98; 14 RR 25-26.

[101] 14 RR 25.

[102] 14 RR 25-26

[103] 14 RR 26.

[104] 14 RR 26.

[105] 14 RR 26.

44Z3116 - 2/15/2024 11:51 AM

genitals."[106] Detective Zamora "advised [Vanessa] to put [Lucca] into counseling and when child is ready to speak and give more details then they will invite child for another interview."[107] Detective Zamora advised that she was "inactivating case until [Lucca] can provide a better outcry. . . . She stated [CPS] was not to interview any perpetrators on case since they are still pending interviews themselves if child makes a detailed outcry when he is ready."[108]

By law, CPS was required to close its investigation within 30 to 45 days of being opened.[109] Because, at that time, CPS had not been able to obtain additional information from witnesses concerning the Initial Outcry, CPS issued an "Unable to Determine" finding on the CPS Investigation and it was administratively closed on December 10, 2019.[110]

## III. The Temporary Restraining Order and the Protective Orders

Vanessa filed her petition for divorce in County Court at Law Number Five (the Divorce Court) on November 14, 2019 (the Divorce Proceedings).[111] Her petition contained a request for temporary restraining order and included an affidavit executed by Vanessa describing a history of incidents where Vanessa

---

[106] 14 RR 26.

[107] 14 RR 26.

[108] 14 RR 26.

[109] 8 RR 108.

[110] 8 RR 108.

[111] 9 RR 28.

expressed concern over Lucca's treatment by his stepcousins, and her requests to Leith to keep Lucca away from them for his safety (the TRO Affidavit).[112] The TRO Affidavit also described Leith's dismissing of Vanessa's concerns for Lucca's safety, and incidents of verbal abuse by Leith toward Vanessa.[113] The TRO Affidavit requested that the Divorce Court issue a temporary restraining order preventing Leith from picking up Lucca and Ella so that they would not be brought around their stepcousins.[114] On November 14, 2019, the Divorce Court entered the temporary restraining order (the TRO) which, among other things, prevented Leith from access to his children during the pendency of the TRO.[115] Leith was served with the TRO on November 22, 2019.[116] The TRO was subsequently extended and a hearing on the TRO was set for December 6, 2019, at 3:00 p.m.[117]

On December 5, 2019, after his interview with Officer Zimmerly, Lucca informed Vanessa that he had told Officer Zimmerly that "on several occasions, as punishment, Leith would pick him up and raise him over his head and then would drop him causing him to hit the ground hurting him. Lucca also told me that his uncle Laboe has grabbed his testicles on more than one occasion, in the presence of

---

[112] 9 RR 30-31, 37-43; 12 RR 57-58.

[113] *See id.*

[114] 12 RR 57-59.

[115] 12 RR 68-76.

[116] 7 RR 115, 118.

[117] 12 RR 152-161.

his father, and his father did not protect him."[118]

On December 6, 2019, ahead of the hearing on the TRO at 3:00 p.m., Vanessa, at the direction of her divorce attorney, executed a second affidavit. The allegations reported to Officer Zimmerly on December 5, 2019, among others, were included in a December 6, 2019 affidavit executed by Vanessa. The second affidavit was attached in support of two applications for protective order filed the same day, requesting, among other things, that Leith and Laboe be prevented from having contact with Lucca or Ella, and that Leith be removed from the family residence.[119] The same day, the Divorce Court entered temporary ex parte protective orders granting the relief sought by Vanessa in her application for same and set a hearing for January 2, 2020 (the Protective Orders).[120] The Protective Orders were replaced and superseded by agreed temporary interim orders signed by Leith and Vanessa on January 2, 2020 (the Agreed Orders).[121] In the Agreed Orders, Leith agrees that his access to his children will be limited to electronic communications until further order of the Divorce Court, and that Laboe is precluded from having access to Lucca and Ella without either Leith or Vanessa

---

[118] 12 RR 78

[119] 12 RR 77-79.

[120] 12 RR 100-117 (Pls.' Ex. 6).

[121] 7 RR 115-17, 126-27. Counsel for Appellant in the trial court moved to admit Plaintiffs' Exhibit 102, the agreed temporary interim orders, into evidence, which the trial court granted. *See id.* at 115. The jury viewed these orders as trial evidence. *See id.* However, that exhibit is not included in the reporter's record of the trial exhibits on appeal. A copy of these orders were attached to Vanessa's motion for summary judgment before the trial court, CR 211-217.

present.[122] The Agreed Orders also assign Lydia Kasmoch (Kasmoch), a therapist, to begin reunification therapy between Lucca and each of his parents.[123]

## IV. The March Outcry

On March 11, 2020, Kasmoch reported an outcry Lucca made to her during a therapy session on March 6, 2020 (the March Outcry).[124] Kasmoch acknowledged that Lucca has not seen Leith since November of 2019.[125] Lucca reported that Leith picks on him and he doesn't like it, that Leith treats him badly, Laboe pulls Lucca's pants on and off hard, and "squeezes [Lucca's] penis so hard it gets big and it hurts so bad [Lucca] can't go to the restroom."[126] Lucca also reported that Leith, Laboe, Damian and Nahomy "all touched [Lucca] with his pants down and pinch [his] front privates."[127] Kasmoch acknowledged that Lucca does not have any access to Leith, Laboe, Damian or Nahomy at the time of the March Outcry.[128]

CPS interviewed Lucca following the March Outcry, on March 14, 2020. In the interview, Lucca claimed he was afraid of his father because he had done "bad

---

[122] CR 211-217.

[123] CR 211-217.

[124] 14 RR 36.

[125] 14 RR 36.

[126] 14 RR 36.

[127] 14 RR 36.

[128] 14 RR 36.

stuff" to Lucca "almost every day."[129] Lucca claimed Leith was hurting Vanessa, Ella and Lucca, and had been punching him all over his body.[130] Lucca said that Leith would cuss at him and Vanessa.[131] Lucca also described detailed, graphic accounts of frequent violent touching of his penis by Leigh, Laboe, and his stepcousins.[132] Lucca stated that these incidents occurred at Laboe's house or at the Daycare.[133]

On March 18, 2020, Detective Zamora informed CPS that the investigation is still on hold until more detailed allegations are made to Kasmoch.[134] If additional interviews were needed by CPS, they would be informed as such by Detective Zamora.[135]

## V.      The April Outcry

On April 7, 2020, Vanessa contacted CPS about an outcry Lucca made to Lourdes on April 5, 2020 (the April Outcry).[136] The April Outcry was merged into the CPS Investigation (reflected in the matching case numbers).[137] Vanessa

---

[129] 14 RR 48.

[130] 14 RR 48.

[131] 14 RR 48.

[132] 14 RR 48.

[133] 14 RR 48.

[134] 14 RR 50-51.

[135] 14 RR 51.

[136] 14 RR 39.

[137] *See* 14 RR 37.

44Z3116 - 2/15/2024 11:51 AM

reported that Lucca first told Lourdes, and then told her, that Leith and Laboe "would put their fingers in his butt and that it would hurt. . . . Lucca also mentioned they would put gloves on (from the kitchen) before putting their finger in his butt."[138] He claimed they would throw him to the ground, straddle him, remove his pants and underwear, and then stick their fingers into his butt.[139] Lucca also claimed they took nude photos and video of him, and would make him repeat profanities on video while pointing at the camera.[140] He further claimed that they would post these pictures and videos online.[141] Lucca claimed that he also witnessed Leith and Laboe hurting Damian and Nahomy, and stated "the same thing happens to them," but it was unclear to Vanessa whether they were being sexually abused.[142]

When the CAC determined no additional contact had occurred between Lucca and Leith, Laboe, or his stepcousins as it related to the allegations in the March and April 2020 Outcries, law enforcement declined to do a second forensic interview.[143] Detective Zamora confirmed that unless Lucca made a new outcry to

---

[138] 14 RR 39.

[139] 14 RR 39.

[140] 14 RR 39.

[141] 14 RR 39.

[142] 14 RR 39.

[143] 14 RR 40-41.

44Z3116 - 2/15/2024 11:51 AM

Kasmoch, a new forensic interview will not be scheduled.[144] The CPS Investigation was administrative closed.[145]

## VI.    The Daycare Investigation

Concurrent with the CPS Investigation, the Department of Family and Protective Services (DFPS) Care Center Licensing (CCL) department was conducting an investigation into the allegations that some of the abuse alleged by Lucca occurred at the Daycare (the Daycare Investigation).[146] The Daycare Investigation "intake" occurred on April 7, 2020.[147] The Daycare Investigation was made regarding the Daycare for purposes of determining whether the Daycare has failed to meet minimum licensing standards.[148] As part of their investigation, CCL interviewed Laboe, Nahomy, Melissa Dozal, Leith, and several daycare clients, "collaterals," and staff members.[149] The CCL employee conducting the Daycare Investigation was Luis Ceballos.[150] Details regarding Ceballos's investigation are

---

[144] 14 RR 53.

[145] 14 RR 40-41.

[146] 14 RR 54.

[147] 13 RR 148.

[148] 8 RR 204-06.

[149] 14 RR 54.

[150] 14 RR 54.

44Z3116 - 2/15/2024 11:51 AM

contained within the CPS records.[151] Mr. Ceballos concluded his investigation on April 9, 2020, and determined there were no concerns he had with the Daycare.[152]

---

[151] 13 RR 148-151.

[152] 14 RR 54.

44Z3116 - 2/15/2024 11:51 AM

## SUMMARY OF THE ARGUMENT

This appeal is factually dense and involves a considerably lengthy record. It also involves heartbreaking allegations of emotional, physical and sexual abuse, and puts a family's apparent discord on display. However, when the issues on appeal are examined apart from the drama that accompany them, this Court will find straightforward matters of law clearly established by the evidence at trial that mandates reversal of the trial court's judgment.

There are two Appellees and each has two causes of action at issue in this appeal. Leith and Laboe each brought a claim for malicious prosecution of a civil claim against Vanessa based on initiating or continuing "administrative proceedings" with CPS—the CPS Investigation—and the CCL—the Daycare Investigation.[153] They also each brought a claim for abuse of process. Leith's cause of action for abuse of process was based on the TRO and the Protective Order, which he claims were fraudulently obtained by providing false information in the affidavits supporting their procurement.[154] Laboe's cause of action for abuse of process was based on the Protective Order for the same reason.[155] On each of these causes of action, the jury answered affirmatively on liability against Vanessa.[156]

---

[153] *See* CR 2450-51 (Jury Charge, Question nos. 1 and 3).

[154] CR 2454 (Jury Charge, Question no. 7).

[155] CR 2455 (Jury Charge, Question no. 9).

[156] CR 2450-55 (Jury Charge).

19

There was legally insufficient evidence to support the jury's answers finding liability against Vanessa on the malicious prosecution and abuse of process claims, and the trial court's judgment on these causes of action must be reversed and rendered in Vanessa's favor.

First, statements made during judicial proceedings, including affidavits, cannot form the basis of a civil cause of action as a result of the judicial-proceedings privilege. Thus, the abuse of process claims based on the TRO and Protective Orders fail as a matter of law. Additionally, statements made in the course of *quasi*-judicial proceedings—like the CPS and Daycare Investigations—cannot form the basis of a civil cause of action as a result of the judicial-proceedings privilege. Thus, the malicious prosecution claims based on the CPS and Daycare Investigations fail as a matter of law.

Furthermore, the evidence at trial conclusively proves that Vanessa established her affirmative defense of immunity under Section 261.106 of the Texas Family Code as a matter of law. The record at trial demonstrates that Vanessa met the standard of good faith reporting of the abuse allegations and Appellees failed to overcome that showing as a matter of law. Therefore, Appellees' cause of action for malicious prosecution based on the CPS Investigation fails as a matter of law.

Second, there was legally insufficient—that is, no evidence—of one or more essential elements of Appellees' malicious prosecution claims. If the Court determines that the CPS Investigation was not quasi-judicial for purposes of the judicial-proceedings privilege, then for the same reason it cannot qualify as an "administrative proceeding" to satisfy the definition of "civil proceedings" in a malicious prosecution claim. The evidence was legally insufficient to prove that the investigations were instituted or continued by Vanessa or at her insistence. And there was simply no evidence at trial of special injury suffered by the Appellees as a result of the CPS or Daycare Investigations.

Third, there was legally insufficient evidence of one or more essential elements of Appellees' abuse of process claims. Appellees failed to plead legally sufficient evidence that Vanessa made improper use of service through the TRO or the Protective Orders after their issuance. For the same reasons, they failed to prove an ulterior motive other than the purpose expressly provided for within the respective orders.

Finally, Appellees failed to present a shred of evidence regarding the existence or amount of damages the jury awarded to them on their causes of action. Rather, Appellees impermissibly offered up a blank slot for the jurors to fill in without providing any basis for what amount might compensate them for their

alleged damages. They likewise failed to sufficiently articulate the type, existence, or duration of damages necessary in awards of non-economic damages.

For all the foregoing reasons, Appellant Vanessa Velez Labrado asks this Court to strike the jury's findings on questions 1, 2, 3, 4, 7, 8, 9, and 10 regarding Appellees claims for malicious prosecution of a civil claim and abuse of process; to reverse the judgment of the trial court and render take-nothing judgment in her favor on all of Appellees' claims against her.

## ARGUMENT

### I.    Standards of Review.

#### Immunity Defenses.

"A party attempting to overcome an adverse fact finding as a matter of law must surmount two hurdles. First, the record must be examined for evidence that supports the [fact finder's] finding, while ignoring all evidence to the contrary. Second, if there is no evidence to support the fact finder's answer, then, the entire record must be examined to see if the contrary proposition is established as a matter of law." *Victoria Bank & Tr. Co. v. Brady*, 811 S.W.2d 931, 940 (Tex. 1991) (quoting *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)).

#### Legal Sufficiency.

A party attacking the legal sufficiency of an adverse finding on an issue in which it did not have the burden of proof "must demonstrate on appeal that no evidence exists to support the adverse finding." *Arcides v. Rojas*, 677 S.W.3d 154,

22

158 (Tex. App.—El Paso 2023, no pet.) (citing *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014). A reviewing court must "consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it." *Id.* at 158-59. (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).

"Anything more than a scintilla of evidence is legally sufficient to support the fact finder's finding." *Sanders Oil & Gas, Ltd. v. Big Lake Kay Constr., Inc.*, 554 S.W.3d 79, 93 (Tex. App.—El Paso 2018, no pet.). "The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Arcides*, 677 S.W.3d at 159 (citing *E. Tex. Educ. Ins. Ass'n v. Ramirez*, 631 S.W.3d 908, 918 (Tex. App.—El Paso 2021, pet. denied)).

## II. Vanessa conclusively proved her defenses of absolute immunity through the judicial-proceedings privilege and statutory immunity under Section 261.106 of the Texas Family Code.

In this case, Appellees' causes of action for malicious civil prosecution were based on initiating or continuing "administrative proceedings" with CPS—the CPS Investigation—and the CCL—the Daycare Investigation.[157] Leith's cause of action for abuse of process was based on the TRO and the Protective Order, which he claims were fraudulently obtained by providing false information in the affidavits

---

[157] *See* CR 2450-51 (Jury Charge, Question nos. 1 and 3).

supporting their procurement.[158] Laboe's cause of action for abuse of process was based on the Protective Order for the same reason.[159] In other words, Appellees claims are based solely on Vanessa's statements to CPS and her sworn statements in the TRO Affidavit and the PO Affidavit.

Vanessa's statements are all subject to the judicial proceedings privilege and cannot be the basis for a claim in tort as a matter of law. Moreover, Vanessa is immune from civil liability for the statements she made to CPS regarding the alleged abuse to Lucca under Section 261.106 of the Texas Family Code (Section 261.106). *See* Tex. Fam. Code Ann. § 261.106. This brief addresses each immunity defense in turn.

In this case, the jury was not afforded an opportunity to make a separate finding of fact regarding either the judicial-proceedings privilege or immunity under Section 261.106. Vanessa's Second Proposed Jury Questions and Instructions to the trial court included both instructions on the definition of good faith and a separate fact question regarding whether she acted in good faith in making her statements to CPS regarding the alleged abuse.[160] Defense counsel likewise objected to the failure to include the instruction and question on

---

[158] CR 2454 (Jury Charge, Question no. 7).

[159] CR 2455 (Jury Charge, Question no. 9).

[160] *See* CR 2380-81 (instructions regarding good faith), 2385-86 (Question nos. 10 and 11).

immunity.[161] Furthermore, the issue was raised in Vanessa's Motion for New Trial.[162] The trial court erred in failing to adequately instruct the jury on either immunity under Section 260.106 or the judicial-proceedings privilege.

**A. The evidence adduced at trial conclusively proves Vanessa's affirmative defense of absolute immunity pursuant to the judicial-proceedings privilege to the malicious prosecution and abuse of process claims.**

The judicial-proceedings privilege protects the judge, jurors, attorneys, parties, and witnesses from any type of liability in tort arising out of statements made during any part of a judicial proceeding, including statements made "in serious contemplation of such a proceeding." *Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 46 (Tex. 2021) (quoting *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 485 n.12 (Tex. 2015) (internal citation omitted)). "[T]he absolute immunity of parties and witnesses from subsequent liability for their testimony in judicial proceedings is well established." *Laub v. Pesikoff*, 979 S.W.2d 686, 689 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (citing *Briscoe v. LaHue*, 460 U.S. 325, 331-32 (1983)). "Any communication, *even perjured testimony*, made in the course of a judicial proceeding, cannot serve as the basis for a suit in tort." *Id.* (citing *Bird v. W.C.W.*, 868 S.W.2d 767, 771 (Tex. 1994)) (emphasis added). The types of communications and statements covered by the privilege include

---

[161] *See* 11 RR 24-31.
[162] CR 2604-05.

"affidavits and any of the pleadings or other papers in the case." *Landry's, Inc.*, 631 S.W.3d at 46 (citing *James v. Brown*, 637 S.W.2d 914, 916 (Tex. 1982)).

Absolute immunity also extends to statements made in quasi-judicial proceedings with quasi-judicial bodies. *See Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 912-13 (Tex. 1942) (the Board of Insurance Commissioners was a quasi-judicial body regulating licensing of insurance agents); *Aransas Harbor Terminal R.R. Comm'n v. Taber*, 235 S.W. 841, 842 (Tex. Comm'n App. 1921) (letters concerning an investigation by the Texas Railroad Commission were covered by the judicial-proceedings privilege). This Court has previously posited that employees of CPS exercise quasi-judicial positions "requir[ing] personal deliberation, decision, and judgment," . . . "such as gathering information in connection with an investigation and making decisions based upon that information." *Gonzalez v. Avalos*, 866 S.W.2d 346, 349 (Tex. App.—El Paso 1993, writ dism'd w.o.j.). Quasi-judicial power is defined as "an administrative agency's power to adjudicate the rights of those who appear before it." *Quasi-Judicial Power*, *Black's Law Dictionary* (10th ed. 2014).

The DFPS, which includes CPS, is a state agency which provides, among other services, "protective services for children…, including investigations of alleged abuse, neglect, or exploitation[.]" Tex. Hum. Res. Code Ann. § 40.002. Additionally, the Texas Supreme Court has described the Department of Protective

26

and Regulatory Services, DFPS' predecessor entity, as "a state agency subject to the Administrative Procedures Act." *See Tex. Dep't of Protective and Reg. Svcs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 173 (Tex. 2004). Additionally, CPS officials have the authority and responsibility to investigate claims of child abuse and, in exigent circumstances, are authorized to remove a child from her home when exigent circumstances warrant such removal. *See, e.g., Martin v. Tex. Dep't of Protective and Reg. Svcs.*, 405 F.Supp.2d 775, 789 (S.D. Tex. 2005); *In re R.A.*, 346 S.W.3d 691, 697 (Tex. App.—El Paso 2009, no pet.).

Here, Appellees' causes of action were based upon affidavits she made in the Divorce Proceedings attached to her Application for Temporary Restraining Order and a subsequent Ex Parte Protective Order.[163] Appellant notes, for the Court's consideration, that according to their Original Petition (the live pleading on file at the time of trial), Appellees base their causes of action for malicious prosecution *and* abuse of process on the affidavits and obtaining the restraining order and/or protective order.[164] However, the Charge of Court lists the CPS investigation as the basis for the malicious prosecution claims.[165] This instruction

---

[163] CR 23-26.

[164] *See* CR 23-25.

[165] *See id.* at 2450-51 (Jury Charge, Question nos. 1 and 3).

was made over the objection of defense counsel, who noted the pleading deficiency to the trial court.[166]

It is axiomatic that any cause of action based upon statements Vanessa made in the TRO Affidavit, the PO Affidavit, or other pleadings or other papers filed within the Divorce Proceedings is protected by the judicial-proceedings privilege and cannot form the basis of a civil cause of action against her. *See Landry's, Inc.*, 631 S.W.3d at 46. This is true even if the affidavits complained about in support of the Temporary Restraining Order and Protective Order contain perjured testimony. *See Bird*, 868 S.W.2d at 771.

Moreover, any statements Vanessa made to CPS in the course of the CPS Investigation constitutes a statement made in a quasi-judicial proceeding with a quasi-judicial body. *See Reagan*, 166 S.W.3d at 912-13; *Gonzalez v. Avalos*, 866 S.W.2d at 349. CPS, in conducting its investigation of the child abuse allegations first reported by Richard Velez and later to Lucca's therapists, obtained those statements from Vanessa as a part of their information gathering duties as an administrative agency. These types of duties "require personal deliberation, decision, and judgment" and therefore qualify as quasi-judicial for purposes of determining whether the privilege applies. *See id.*[167]

---

[166] 10 RR 152-53.

[167] As Appellant will address in greater detail later in this Brief, if the Court determines that the CPS Investigation of Leith and Laboe was not quasi-judicial—that is, that it does not rise to the

**Appellant conclusively proved her affirmative defense of immunity under Section 261.106 of the Texas Family Code.**

Vanessa likewise pleaded and proved, as a matter of law, her right to immunity from civil litigation for reporting suspected child abuse under Section 261.106 of the Texas Family Code (Section 261.106). *See* Tex. Fam. Code Ann. § 261.106.

The Texas Family Code places a duty on *any* "person having reasonable cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person" to immediately make a report of that abuse. *See* Tex. Fam. Code Ann. §261.101(a). Additionally, for licensed "professionals" in Texas, such report must be made within 48 hours of learning of the alleged abuse. *Id.* § 261.101(b). Section 261.106 provides, in pertinent part,

> (a) A person acting in good faith who reports or assists in the investigation of a report of alleged child abuse or neglect or who testifies or otherwise participates in a judicial proceeding arising from a report, petition, or investigation of alleged child abuse or neglect is immune from civil or criminal liability that might otherwise be incurred or imposed. *Id.* § 261.101(a).

A court determining whether a defendant has acted in good faith as described in Section 261.106 should apply the same test as would be applied in an official

---

level of an administrative agency having the right to adjudicate the rights of the persons appearing before it—then Appellees will have failed as a matter of law to adduce legally sufficient evidence that the CPS investigation constitutes a civil proceeding instituted or continued against them as is necessary for their malicious civil prosecution claim.

immunity assessment. *Chaney v. Corona*, 103 S.W.3d 608, 611 (Tex. App.—San Antonio 2003, pet. denied). There is no dispute among the parties that Vanessa, as Director of the CARES Clinic and in her other roles as a health care practitioner, is a "professional" as that term is defined in the Texas Family Code Section 261.101(b). *See* Tex. Fam. Code Ann. § 261.101(b).[168] Appellees' counsel elicited that very testimony from Vanessa at trial:

Q. And he related to you what he claims Lucca shared with him. Correct?

A. Correct.

Q. And you believe that to be an outcry?

A. Correct.

Q. And you told him that he needed to report it. Is that true?

A. Could you clarify "him"?

Q. Richard.

A. Yes.

Q. You could have reported it yourself. Correct?

A. No.

Q. Do you remember hearing Amanda Martinez [with CPS] say that you can't delegate when you're a professional?

---

[168] "In this subsection, 'professional' means an individual who is licensed or certified by the state or who is an employee of a facility licensed, certified, or operated by the state and who, in the normal course of official duties or duties for which a license or certification is required, has direct contact with children. The term includes teachers, nurses, doctors, day-care employees, employees of a clinic or health care facility that provides reproductive services, juvenile probation officers, and juvenile detention or correctional officers." Tex. Fam. Code Ann. § 261.101(b).

A. Yes.

Q. Do you disagree with that?

A. No.

Q. ***You're saying you don't have any duty as a mandatory reporter to make a report of this abuse?***

A. ***If I am the initial individual to obtain the outcry, yes. Richard cannot delegate that to me.***

Q. ***But once you had that information, you're a mandatory reporter nonetheless. Correct?***

A. ***Correct.***[169]

The test, then, in this case, is "that a reasonably prudent [professional], under the same or similar circumstances, could have believed that reporting the abuse was justified based on the information she possessed." *See Chaney*, 103 S.W.3d at 611 (describing good faith test for a principal who reported suspicion of child abuse by a teacher as being whether a reasonably prudent principal under the same or similar circumstances would have found reporting the suspected abuse justified). This does not require Vanessa to prove "that it would have been unreasonable *not* to make the report, or that all reasonably prudent [professionals] would have made the report." *Id.* (citing *Telthorster v. Tennell*, 92 S.W.3d 457, 465 (Tex. 2002)). Negligence on the part of the reporter does not defeat good faith; "the test is not 'what a reasonable person would have done,' but [instead] 'what a reasonable

---

[169] 9 RR 66-67.

[professional] could have believed.'" *Id.* (quoting *Telthorster*, 92 S.W.3d at 465) (bracketed text substituted). Once Vanessa proved good faith, Appellees were required to "offer evidence that no reasonable [professional] in [Vanessa's] position could have believed that the facts were such that they justified her conduct." *See id.* If two professionals "of reasonable competence" could disagree about whether or not to report the outcry, Vanessa's good faith is established as a matter of law. *See id.*

The record at trial is replete with evidence that reasonably prudent professionals believed reporting Lucca's outcry to CPS was justified. CAC officers informed CPS investigators that the elements for injury to a child had been met under the facts of the case because Lucca reported pain.[170] Lydia Kasmoch, Lucca's second therapist, reported the April Outcry to CPS independently of Vanessa.[171] Kasmoch testified that her reunification therapy with Leith and Lucca stopped "once the [March Outcry] [was] made and I had to make reports to various agencies."[172] Kasmoch elaborated that the requirement to report also necessitates making statements to various agencies as required when they conduct their investigations.[173] She further testified that she did not suspect Lucca of "parroting"

---

[170] 14 RR 23.

[171] 10 RR 61-62, 67.

[172] 10 RR 61.

[173] 10 RR 61-62.

the words of someone else in the course of her therapy sessions with him, including his outcry to her, which she reported.[174] Amanda Martinez, a supervisor with CPS investigations, testified that Vanessa would have a duty to report allegations of abuse as a mandatory reporter under the statute.[175] Even Laboe, himself a "professional" under the statute, testified that when it comes to allegations of abuse, "Every single person who was told who has a reasonable belief that this child made this alleged – this allegation has to report, has to talk to the [CPS] intake line. … In the statute – we are trained on this. If you hear it, you have to call. You cannot delegate. You cannot rely on somebody else to call."[176]

The foregoing illustrates that Vanessa proved the report was made in good faith as a matter of law. *See Chaney*, 103 S.W.3d at 611. Thus, the burden shifted to Appellees to "offer evidence that no reasonable [professional] in [Vanessa's] position could have believed that the facts were such that they justified her conduct." *See id..* Appellees made no such offering in the trial court. Appellees offered expert testimony from Kamala London, Ph.D., to testify regarding the reliability of children's reports regarding alleged abuse.[177] She posited that some of Lucca's allegations were "confabulated"—that is, fantastical and appeared blown

---

[174] 10 RR 69.

[175] 8 RR 135.

[176] 8 RR 29.

[177] *See* 9 RR 119 *et seq.*

33

out of proportion—but even she testified, "I'm not here to criticize anyone's mothering, you now. I think it —the way that it came about is problematic from a memory perspective. But I – I know moms and dads, you know, they alllove their kids. . . . [T]hey might do different things than if they were the professional or they're worried or, you know, whatever."[178] She likewise failed to offer any testimony demonstrating that no professional, as that term is defined in Section 261.101, *in Vanessa's position*, could have believed the facts of the various outcries such that the decision to report them was unfounded. At best, she offered testimony that no expert in developmental psychology with a specialty in forensic interviews could have believed the facts forming the basis of Lucca's outcries.[179] Appellees failed to overcome the showing of good faith and Vanessa demonstrated her Section 261.106 affirmative defense as a matter of law.

**III.    The evidence was legally insufficient to support the jury's finding of liability against Vanessa for malicious prosecution of a civil claim and the trial court erred as a matter of law entering judgment against Vanessa based on that erroneous verdict.**

To prevail in a suit alleging malicious prosecution of a civil claim, the plaintiff must establish: (1) the institution or continuation of civil proceedings against the plaintiff; (2) by or at the insistence of the defendant; (3) malice in the commencement of the proceeding; (4) lack of probable cause for the proceeding;

---

[178] 9 RR 157, 205.

[179] *See* 9 RR 121-123.

(5) termination of the proceeding in plaintiff's favor; and (6) special damages. *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 207 (Tex. 1996).

In addition to Vanessa proving her affirmative defenses of immunity as a matter of law as addressed in Section II of this Brief, Appellees failed to present legally sufficient evidence of one or more essential elements of its malicious civil prosecution claim. Specifically, there is no evidence that civil proceedings were commenced against the Appellees by virtue of the CPS investigation, there is no evidence they were instituted or continued at Vanessa's insistence, and Appellees failed to demonstrate that Appellees suffered special damages as a result of the investigations.

### A. There is no evidence that a civil proceeding was instituted or continued against the Appellees.

The threshold issue in a malicious prosecution case is the institution or continuation of a "civil proceeding" against the plaintiff. *Tex. Beef*, 921 S.W.2d at 207. Other than civil lawsuits, proceedings before administrative agencies may support a claim for malicious prosecution. *See, e.g., Johnson v. State Bd. of Morticians*, 288 S.W.2d 214, 217 (Tex. App.—Galveston 1956, no writ). Appellees argued to the jury that the CPS Investigation and the Daycare Investigation were "civil proceedings" which could support a malicious

prosecution claim.[180] Both investigations were submitted to the jury in the liability questions regarding malicious prosecution and were described as "administrative proceedings."[181] The charge also included an instruction that "administrative proceedings" can support a claim for malicious prosecution.[182] There is no evidence in the record at trial that Appellees posited the investigations constituted another type of "civil proceeding" other than an administrative proceeding.[183]

Black's Law Dictionary defines "administrative proceeding" as "[a] hearing, inquiry, investigation, or trial before an administrative agency usually adjudicatory in nature but sometimes quasi-legislative." *Administrative Proceeding*, *Black's Law Dictionary* (10th ed. 2014).

As previously discussed in the prior issue, there are indications in case law and statutory law that the CPS Investigation and the Daycare Investigation constitute administrative proceedings that are quasi-judicial in nature because they determine the rights of those appearing before them. *See, e.g.*, *Martin*, 405 F.Supp.2d at 789; *In re R.A.*, 346 S.W.3d at 697. However, Appellant was unable to find case law in Texas explicitly determining that a CPS investigation standing

---

[180] CR 2450-51.

[181] CR 2450-51.

[182] CR 2450-51.

[183] As Vanessa's trial counsel objected during the final jury charge conference, it was improper for the trial court to have included an implicit instruction or other indication that the CPS Investigation and the Daycare Investigation were "administrative proceedings." 11 RR 24-31.

alone was sufficient to constitute a "civil proceeding" in a malicious prosecution of a civil claim lawsuit.[184]

In this case, if the Court determines that the CPS Investigation and the Daycare Investigation are administrative proceedings as the term is contemplated in a malicious prosecution claim, then it must also hold as a matter of law that Vanessa is entitled to immunity from any civil claims arising out of statements she made in those investigations as protected by the judicial-proceedings privilege. If, on the other hand, the Court determines that the CPS and Daycare Investigations are *not* administrative proceedings in which the judicial-proceedings privilege applies, then it necessarily must also find that Appellees failed to adduce legally sufficient evidence of the institution of a civil proceeding necessary to support a claim for malicious civil prosecution.

In addition, for purposes of supporting the malicious prosecution claims, the Daycare Investigation was not instituted against Leith or Laboe; it was instituted solely regarding the Daycare in the context of licensing issues.[185] There is simply no evidence to support any finding by the jury that the Daycare Investigation could

---

[184] Relying on a CPS investigation as the basis for a claim of malicious *criminal* prosecution is a more common occurrence. *See, e.g., Alvarez v. Anesthesiology Assoc.*, 967 S.W.2d 871 (Tex. App.—Corpus Christi-Edinburg 1998, pet. denied); *Howard v. White*, No. 05-01-01036-CV, 2002 WL 1470071 (Tex. App.—Dallas Jul. 10, 2002, no pet.).

[185] 8 RR 204-06.

44Z3116 - 2/15/2024 11:51 AM

form the basis of a malicious prosecution claim against one of the individual Appellees.

### B. There is no evidence the proceeding was instituted or continued by Vanessa or at Vanessa's insistence.

The second element of a malicious prosecution claim is that the civil proceeding was instituted or continued by Vanessa or at her insistence. *See Tex. Beef*, 921 S.W.2d at 207.

It is undisputed that Richard was the initial reporter of the Initial Outcry to CPS on November 11, 2019.[186] There is no evidence in the record at trial that Richard was not the initial reporter to CPS. He testified that he and Vanessa agreed that he, as the initial recipient of the outcry, needed to report the matter to CPS.[187] The CPS Investigation was then administratively closed on December 10, 2019.[188]

The next record of a reported outcry from Lucca was the March Outcry Kasmoch reported to CPS on March 11, 2020. CPS began its investigation into the March Outcry allegations.[189] While the CPS Investigation into the March Outcry

---

[186] 14 RR 10.

[187] 9 RR 66.

[188] 8 RR 108.

[189] 14 RR 46-54.

reported by Kasmoch was still open, Vanessa reported the April Outcry to CPS.[190]

The CPS Investigation was administratively closed on April 12, 2020.[191]

The evidence at trial is legally insufficient to support the jury's finding that Vanessa instituted or continued the CPS Investigation against Leith and Laboe, or that it was instituted or continued at her insistence. Rather, the evidence conclusively demonstrates that the *only* report of new abuse Vanessa made to CPS was regarding the April Outcry while the CPS Investigation regarding the March Outcry was already pending.[192] Just a few days later, on April 12, 2020, the CPS Investigation was again administratively closed as unable to determine.[193]

Regarding the Daycare Investigation, the only evidence adduced at trial regarding how the investigation against the Daycare was instituted came from Luis Ceballos, an investigator for the CCL.[194] Ceballos testified that if allegations of abuse name an owner, director or employee of a daycare, a companion case investigating the daycare is automatically created under the CCL's purview.[195] He confirmed such was the case when the Daycare Investigation was opened; it was automatically created by DFPS as a companion case after allegations were made

---

[190] 14 RR 52.

[191] 14 RR 54.

[192] 14 RR 52.

[193] 14 RR 54.

[194] 8 RR 211.

[195] 8 RR 211-213.

against Laboe in the CPS Investigation.[196] Thus, the evidence at trial conclusively proves Vanessa did not institute or continue either the CPS or the Daycare Investigation against Leith or Laboe.

## C. There is no evidence Appellees suffered special injury as a result of the proceeding.

Finally, Appellees failed to demonstrate special injury as a result of the Investigations. To obtain damages for malicious prosecution of a civil claim, a plaintiff must first prove he has sustained a "special injury;" that is, he must prove he "suffer[ed] some interference, by reason of the suit, with his person or property." *Butler v. Morgan,* 590 S.W.2d 543, 545 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) (citing *Pye v. Cardwell*, 222 S.W. 153 (Tex. 1920)). The interference must be physical to qualify as a special injury. *See Tex. Beef*, 921 S.W.2d at 209. For claimed interference with property, such interference may take the form of "attachment, an appointment of receiver, a writ of replevin or an injunction[.]" *Airgas-Sw., Inc. v. IWS Gas & Supply of Tex., Ltd.*, 390 S.W.3d 472, 479. (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (citing *Sharif-Munir-Davidson Dev. Corp. v. Bell,* 788 S.W.2d 427, 430 (Tex.App.—Dallas 1990, writ denied) (recording a notice of lis pendens is not "actual seizure" of property necessary to prove special injury). For claimed interference with one's person, it may be "an arrest or detention[.]" *Id.* "Ordinary interferences with persons and

---

196

property that any party suffers incident to a civil suit are not of the type that supports an action for malicious prosecution. *Id.* (citing *Tex. Beef,* 921 S.W.2d at 208-09; *Butler,* 590 S.W.2d at 545; *Blanton v. Morgan,* 681 S.W.2d 876, 878 (Tex.App.--El Paso 1984, writ ref'd n.r.e.)). Additionally, "consequential damages resulting from the underlying suit," without the requisite physical interference constituting special damages, cannot support an action for malicious prosecution. *See id.* at 479-80. (depositions, subpoenas, attorney's fees and litigation costs, damage to reputation, humiliation, mental anguish, loss of business, and other economic losses, among others, are insufficient to prove the threshold special injury). It is only after "the special injury hurdle has been cleared" that a plaintiff has an opportunity to recover the full range of damages available in a malicious prosecution case. *Id.* at 480 (citing *Tex. Beef*, 921 S.W.2d at 209).

In *Airgas-Southwest, Inc. v. IWS Gas and Supply of Texas, Ltd.*, Airgas filed a temporary restraining order against IWS to prevent it from contacting or hiring Airgas employees, or contacting customers who were not already IWS customers. *Id.* Relying on the language in *Texas Beef* regarding injunctions, IWS posited that the temporary restraining order filed against it satisfied the special injury requirement. *Id.* But the First District Court of Appeals rebuked IWS's broad interpretation of the Texas Supreme Court's discussion in *Texas Beef* and noted that the restraining order in the instant case restrained IWS's employees' persons

41

by preventing certain activities, but did not directly affect their property. *Id.* at 481. The *Airgas* court articulated the common law history of malicious prosecution of civil suits and noted Texas courts' long-standing position that "where there is no arrest of the person or seizure of the property, or other like injury," there has been no special injury and there can, therefore, be no malicious prosecution claim. *Id.* at 481-82 (citing *Salado Coll v. Davis*, 47 Tex. 131, 136 (1877)). And, as the *Airgas* court pointed out, "We have not discovered any Texas authority to support the proposition that someone has a claim for malicious prosecution because of an interference with his person that did not amount to a physical arrest or detention." *Id.* at 483.

Here, Appellees purportedly presented evidence of, and argument to, the jury that their "special injury" in support of their malicious prosecution claim was being kept away from Lucca and Ella,[197] and Leith being enjoined from residing at his home.[198] But the evidence unequivocally proves that Appellees' preclusion from access to Lucca and Ella and Leith's removal from the home occurred as a result of the TRO and/or the Protective Orders, *not* because of the CPS Investigation or the Daycare Investigation.[199] In fact, no evidence was presented to the jury that CPS or the DFPS required that Leith or Laboe should be prevented

---

[197] 7 RR 57, 101.

[198] 7 RR 99.

[199] 7 RR 57, 99, 101.

44Z3116 - 2/15/2024 11:51 AM

from having access to Lucca and Ella, and there is certainly no evidence that CPS or the DFPS took any action to do so. The CPS records repeatedly refer to Appellees' access to Lucca and Ella as nonexistent as a result of the protective orders in place. The same is true for Leith's preclusion from living at the Blacker residence. Such removal occurred, by Leith's own testimony, following issuance of the December 6, 2019 protective order.[200] Leith testified that he has never been detained or as a result of the allegations in this case.[201] The jury was not presented with legally sufficient evidence, or any evidence at all, that there had been a physical There is, therefore, no evidence of special injury to Leith or Laboe which occurred as a result of the CPS Investigation.

For these reasons, the evidence was legally insufficient to support the jury's answers to questions 1, 2, 3, and 4, finding liability and damages on Appellees' claims for malicious prosecution, and the trial court's judgment reflecting the jury's erroneous verdict on these questions must be reversed and rendered in favor of Appellant.

**IV. The evidence was legally insufficient to support the jury's finding of liability against Vanessa for abuse of process and the trial court erred as a matter of law entering judgment against Vanessa based on that erroneous verdict.**

---

[200] 7 RR 99.

[201] 7 RR 123.

Appellees' claims for abuse of process were based upon Vanessa's affidavits in support of the Temporary Restraining Order and two Applications for Protective Order. To prove a claim for abuse of process, a plaintiff must plead and prove (1) that he was served with valid process, (2) the defendant made an illegal, improper, or perverted use of the process after it was issued, (3) the defendant had an ulterior motive or purpose in using the process, and (4) the plaintiff suffered injury as a result of the improper use. *See Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781, 815 (Tex. App.—Austin 2017); *Blanton v. Morgan*, 681 S.W.2d 876, 878 (Tex. App.—El Paso 1984, writ ref'd n.r.e.).

In addition to Vanessa proving her affirmative defenses of immunity as a matter of law as addressed in Section II of this Brief, there is also no evidence of one or more essential elements of Appellees' abuse of process claims against Vanessa and the evidence was, therefore, legally insufficient to support the jury's answers to questions 7, 8, 9, and 10. Specifically, there is no evidence of an illegal, improper, or perverted use of the process made on Appellees; and there is no evidence of an ulterior motive or purpose in using the process.[202]

---

[202] Appellant also asserts that Appellees failed to demonstrate injury as a result of the improper use because it cannot prove improper use in the first instance. To the extent necessary to preserve that element for appellate review and to avoid any claim of briefing waiver, Appellant likewise asserts the evidence was legally insufficient to support the jury's answers to questions 7 and 9 regarding liability for abuse of process because Appellees failed to produce any evidence at trial of injury caused by improper use of process. *See Martinez*, 267 S.W.3d at 528.

## A. There is no evidence that Vanessa made an illegal, improper, or perverted use of the process after it was issued.

The second essential element of an abuse of process cause of action is the illegal, improper, or perverted use of process otherwise validly issued. *Martinez v. English*, 267 S.W.3d 521, 528 (Tex. App.—Austin 2008, pet. denied). In order for the process to be used improperly, it must be used in a way that is not authorized by the process. *See Graves v. Evangelista-Ysasaga*, No. 14-22-00137-CV, 2023 WL 370589, at * 5 (Tex. App.—Houston [14th Dist.] 2023, pet. denied) ("[T]o sustain an abuse-of-process claim, 'it is critical that the process be improperly used *after* it has been issued.'").

Here, Appellees claim they were "served with valid process and as parties to the Divorce Case and protective order case(s)."[203] There is no dispute that Leith was validly served with process in the Divorce Proceedings. However, there is no evidence that *Laboe* was served with process in the Divorce Proceedings when they were initiated in November of 2019. The evidence conclusively demonstrates he was first served with process of the Protective Order which ordered him not to have contact with Lucca or Ella, the very purpose he claims is improper in the service.[204] Laboe makes no further complaint about the Protective Order or its implications other than what it prevented him from doing as stated on its face,

---

[203] CR 25.

[204] CR 25-26; 8 RR 11.

44Z3116 - 2/15/2024 11:51 AM

which was preventing him from seeing his niece and nephew.[205] In other words, Laboe takes issue *only* with the Protective Order's authorized use which occurred at the time of its issuance. *See Graves*, 2023 WL 370589, at * 5. There is simply no evidence of improper use as it pertains to Laboe's claims.

Leith takes issue with Vanessa obtaining the TRO and the Protective Orders after initiating the Divorce Proceedings.[206] According to Appellees' Original Petition, Vanessa made improper use of process "by executing the affidavit of November 14, 2018 and the ex parte affidavits of December 6, 2019[,] to obtain the restraining order and protective orders, respectively" for purposes of "obtain[ing] an advantage in the Divorce Case to obtain custody of the children[.]"[207] But, "[a] claim based on the filing and maintaining of a lawsuit and the obtaining of a temporary restraining order cannot constitute abuse of process, because abuse of process refers to the improper use of the process after it has been issued." *Spencer v. Overpeck*, 2017 WL 993093, at * 6 (Tex. App.—San Antonio Mar. 15, 2017, pet. denied). Even when a petition is based on false allegations which lead to the entry of a temporary restraining order, there must be some evidence of how the restraining order itself, once obtained, was improperly used. *Id.*

---

[205] 8 RR 11.

[206] CR 25-26.

[207] CR 25.

44Z3116 - 2/15/2024 11:51 AM

Here, all of Leith's abuse-of-process complaints involve allegations of dishonesty by Vanessa in executing the TRO Affidavit and the PO Affidavit. However, he did not present any evidence to the trial court that either the TRO or the Protective Order were used improperly after they were issued. His only complaints relate to being prevented from seeing his children, which is part of the express purpose for Vanessa having obtained the two orders.[208] There is no question that the process at issue here was used for a purpose that the law intends—namely, to prevent access to children when there are allegations of abuse. *See Detenbeck v. Koester*, 886 S.W.2d 477, 480-81 (Tex. App.—Houston [1st Dist.] 1994, no writ).

### B. There is no evidence that Vanessa had an ulterior motive or purpose in using the process.

The third element of an abuse of process claim is that the plaintiff has an ulterior motive in using the process improperly. *Martinez*, 267 S.W.3d at 521. For many of the same reasons articulated regarding improper use, Appellees failed to supply the trial court with any evidence of an ulterior motive by Vanessa in using the process. *See Montemayor v. Ortiz*, 208 S.W.3d 627, 650 (Tex. App.—Corpus Christi 2006, pet. denied) (an ulterior motive combined with the process being

---

[208] Appellees' Original Petition claims the Temporary Restraining Order and Protective Orders were improperly used for Vanessa to gain an advantage in the Divorce Proceedings by having possession of the children. *See* CR 25-26. However, even if there was some evidence of this, which there is not, demonstrating improper use cannot be accomplished by demonstrating the defendant gained an advantage in the same proceeding where the process was issued. *See Davis v. West*, 433 S.W.3d 101, 111 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

used for its intended purpose is not an abuse of process). Vanessa testified unequivocally that her reasons for wanting to get the Temporary Restraining Order and the Protective Orders was to prevent her children from being exposed to Nahomy and Damian, and later Leith and Laboe.[209] Those reasons are precisely the basis for and the use described in the respective orders. Appellees offered no evidence of ulterior motive—that is, some purpose that the orders would be used other than the express purpose stated in the orders. *See id.*

Because there was no evidence, and certainly legally insufficient evidence, supplied at trial which was required to prove one or more essential elements of Appellees' claims for abuse of process, there was no evidence to support the jury's answers to questions 7, 8, 9 and 10, and the trial court erred in entering judgment based on the jury's erroneous verdict.

## V. There is legally insufficient evidence in the trial record to support the jury's answers regarding damages.

Finally, Appellees failed to satisfy their burden of proof regarding the existence or amount of damages awarded in questions 2, 4, 6, and 8 and the evidence at trial was legally insufficient to support the jury's answers to these questions.

> "An award for mental anguish must be supported by direct evidence of either (1) a substantial disruption in the plaintiff's daily routine, or (2) evidence of a high degree of mental pain and distress that is more

---

[209] 9 RR 30.

than mere worry, anxiety, vexation, embarrassment, or anger. There must be evidence of the existence of compensable mental-anguish damages and evidence to justify the amount awarded." *Bennett v. Grant*, 525 S.W.3d 642, 648 (Tex. 2017).

In *Service Corp. Intern. v. Guerra*, 348 S.W.3d 221, 226 (Tex. 2011), three daughters and their mother sued a company for mishandling of a corpse regarding their father's remains. In testifying about damages, one daughter testified, "'[t]his has been the hardest thing that I have had to go through with my family and myself. I have had lots of nights that I don't sleep just thinking' and that it has been 'very difficult.'" *Id.* at 232. She testified that she nevertheless continued working, traveling, volunteering and conducting other life activities. *Id.* Another daughter testified "[w]e're not at peace. We're always wondering. You know, we were always wondering where our father was. It was hard to hear how this company stole our father from his grave and moved him. That was hard. And I pray that none of you have to go through this." *Id.* The third daughter testified, "it's not part of my life. I didn't have to accept that and I do not accept it and I won't accept it." *Id.* There, the Texas Supreme Court held that the evidence at trial regarding mental anguish damages for the three daughters was legally insufficient even though the claim was "of the type for which mental anguish damages are recoverable." *Id.* at 231 ("Even when an occurrence is of the type for which mental anguish damages are recoverable, evidence of the nature, duration, and severity of the mental anguish is required.").

44Z3116 - 2/15/2024 11:51 AM

Moreover, while legally sufficient evidence of the nature, duration and severity of the alleged mental anguish is required, "there must also be some evidence to justify the amount awarded." *Gregory v. Chohan*, 670 S.W.3d 546, 563-64 (Tex. 2023) (quoting *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996)). Even sufficient evidence of the *existence* of mental anguish suffered by a plaintiff "is no evidence, standing on its own, of the *amount* of damages incurred on account of that suffering." *Id.* at 563. "[T]he jury's discretion [to assign a dollar value to noneconomic damages] is by no means unlimited[.]" *Id.* at 557. "Juries cannot simply pick a number and put it in the blank." *Bentley v. Bunton*, 94 S.W.3d 561, 606 (Tex. 2002).

There is insufficient evidence in the trial record of the nature, duration, or severity of Appellees' purported anguish to establish the existence of a substantial disruption in their daily routine or other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. With respect to alleged damages for mental anguish, the totality of evidence of Leith's alleged damages are as follows:

- Leith testified that because he could not see his children, "there's been many times especially at the beginning where I couldn't sleep. I couldn't eat. Affected my work, affected my daily life."[210]

---

[210] 7 RR 107.

- He testified that he has seen a counselor.[211]

- He testified that he is worried he will not have the same relationship with his children as he had previously before the allegations regarding the abuse were made.[212]

- He testified that with regard to his daughter, he has missed out on potty training, teaching her how to ride a bike, teaching her to swim, and building a bond with her.[213]

- He could not testify about anything he has missed out on with his son other than, "[h]is school, his friends."[214]

Laboe's only evidence regarding alleged mental anguish damages were:

- The investigation from the daycare licensing agency made him "very embarrassed, very upset, very frustrated, and very very sad."[215]

- The allegations against him were "very embarrassing. It was horrible. It's a horrible feeling to have to talk with [sic] these accusations to people that you work with on a professional level." . . . "this is the worst of the worst that can happen in daycare."[216]

---

[211] 7 RR 107.

[212] 7 RR 102.

[213] 7 RR 102-03.

[214] 7 RR 103.

[215] 7 RR 160.

[216] 7 RR 162.

44Z3116 - 2/15/2024 11:51 AM

- The allegations made against his children regarding the abuse made him feel "horrible, embarrassed, and just sad."[217]

- Telling his parents about the allegations made against him made him feel "[h]umiliated, mad, extremely sad. It was one of the most horrible experiences I had to tell my parents."[218]

- Laboe stated he experienced problems with "loss of sleep, weight loss, extreme duress, constant fear[,]" but offered no elaboration.[219]

- He testified he got physically ill, but failed to identify any details of the alleged illness.[220]

- When asked about his professional reputation after the allegations were made, Laboe testified, "It was harmed."

- His biggest fear about what happened to him in the past is "that these allegation [sic] do not stop, that the defendant does not stop harassing, making these false allegations, continuing hurting the business, continually harming the relationship I had with Nahomy and Damian. That's my greatest fear."[221]

---

[217] 7 RR 164.

[218] 8 RR 26.

[219] 8 RR 38.

[220] 8 RR 38-39.

[221] 8 RR 40.

Appellees' testimony fails to rise to the level of purported anguish to establish the existence of a substantial disruption in their daily routine because of that mental anguish, or any other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. Additionally, there was no evidence of the nature, duration, and severity of the feelings Appellees described which purport to constitute mental anguish. Rather, the feelings described by Appellees are precisely of the type the Texas Supreme Court deemed legally insufficient to support a finding of mental anguish damages. *See Guerra*, 348 S.W.3d at 232.

Additionally, there was no evidence to support the *amount* of damages awarded by the jury. *See Bentley*, 94 S.W.3d at 606-07. When asked whether he was asking for a certain amount of money from the lawsuit, Leith responded, "I think it was filed for five million. But it just – that's not going to bring my kids back. It's not going to bring my four years back. And probably tell you, whatever the jury – [.]"[222] Laboe, on the other hand, never offered any testimony or other evidence regarding an amount of damages he sought in the case.

Appellees' counsel made comments regarding assigning a value of mental anguish damages in closing arguments.[223] Specifically, he stated,

---

[222] 7 RR 105.

[223] 11 RR 70.

Ladies and gentlemen, that brings us to damages. And if I were to say to you, you know, what sum of money could I offer you to be separated from your children, you would probably say, well, there would be no sum of money that you could offer me to do that. And we would agree that a child to a parent is priceless. The fact of the matter is, what happened to Leith Labrado and his brother and their business was separation from family members, family members from each other and then from their niece and nephew. And it's persisted for four years. So what is it worth? Is it worth $100,000? Is it worth $250,000? 500? One million? What sum of money would you take to be separated from your children like that? What is it worth? And I would ask you, ladies and gentlemen, to honor that and consider it seriously. Because this is the kind of case that is important.[224]

The argument made by Appellees' counsel, and the one statement made by Leith regarding an amount of mental anguish damages, asks the jury to do exactly what the Texas Supreme Court proscribes over decades of jurisprudence. It suggests that the jury had unlimited discretion to assign a value to the mental anguish allegedly suffered by the Appellees; to pick a number and write it in the blank. *See Gregory*, 670 S.W.3d at 557; *Bentley*, 94 S.W.3d at 606. There is, simply, no evidence of either the existence or amount of mental anguish damages allegedly suffered by the Appellees. Thus, the evidence is legally insufficient to support the jury's answers to Questions 2, 4, 8, and 10.

---

[224] 11 RR 70.

44Z3116 - 2/15/2024 11:51 AM

## PRAYER

The jury's answers to questions 1, 2, 3, 4, 7, 8, 9, and 10 regarding Appellees claims for malicious prosecution of a civil claim and abuse of process were not supported by legally sufficient evidence at trial. In fact, the evidence adduced at trial conclusively demonstrates that Appellant cannot be liable to Appellees for the causes of action complained of based on affirmative defenses of judicial proceedings privilege and immunity under Section 261.106 of the Texas Family Code. Additionally, the evidence at trial was legally insufficient to prove one or more essential elements of Appellees' claims against her. Appellant is entitled to take-nothing judgment on all of Appellees' claims as a matter of law based on the evidence presented to the trial court and the jury.

For all the foregoing reasons, Appellant Vanessa Velez Labrado asks this Court to strike the jury's findings on questions 1, 2, 3, 4, 7, 8, 9, and 10 regarding Appellees claims for malicious prosecution of a civil claim and abuse of process; to reverse the judgment of the trial court and render take-nothing judgment in her favor on all of Appellees' claims against her, and for any other relief to which she may show herself entitled at law or in equity.

*<Signature page follows.>*

55

Respectfully submitted,

**KEMP SMITH LLP**
221 N. Kansas, Suite 1700
El Paso, Texas 79901
Telephone: (915) 533-4424
Facsimile: (915) 546-5360

By:  */s/ Rachel C. Moreno*
RACHEL C. MORENO
Rachel.Moreno@kempsmith.com
State Bar No. 24078321

Attorneys for Appellant

## CERTIFICATE OF COMPLIANCE

I certify that this document was produced on a computer using Microsoft Word 2016 with a 14-point font conventional typeface and 12-point font for any footnotes. Excluding the sections of the document listed in Rule 9.4(i)(1) of the Texas Rules of Appellate Procedure, this document contains 12,112 words, as determined by the computer software's word-count function.

 */s/ Rachel C. Moreno*
Rachel C. Moreno

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document has been served by e-service upon the following, in accordance with Rule 9.5 of the Texas Rules of Appellate Procedure, on this 29th day of October, 2024.

Troy C. Brown
1074 Country Club Rd.
Suite B-4
El Paso, Texas 79932
troy@tcblegal.com
*Attorney for Appellee Leith Labrado*

Laura Enriquez
Laura Enriquez and Associates, PLLC
221 N. Kansas, Suite 710
El Paso, TX 79901
enriquez@leeplaw.com
*Attorney for Appellee Laboe Labrado*

 */s/ Rachel C. Moreno*
Rachel C. Moreno

56

# APPENDIX

IN THE 243rd JUDICIAL DISTRICT COURT
EL PASO COUNTY, TEXAS

FILED
NORMA FAVELA BARCELEAU
DISTRICT CLERK

2024 FEB -3 PM 6: 02

EL PASO COUNTY, TEXAS

BY _____
DEPUTY

LEITH LABRADO, LABOE LABRADO & §
THREE R'S SCHOOL, LLC. §
§
§
*Plaintiffs,* , §
§
§
*v.* § Cause No. 2021DCV3955
§
§
VANESSA VELEZ LABRADO, §
§
§

## CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by other means. Do not do any independent investigations about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason.

Here are the instructions for answering the questions:

1.      Do not let bias, prejudice or sympathy play any part in your decision.

2.      Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not presented in the courtroom.

3.      You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all my instructions.

4.      If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.      All the questions and answers are important. No one should say that any question

2463

or answer is not important.

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11. The answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over gain. This would waste your time and the parties' money and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

2

2464

## I.

The elements of a cause of action for malicious [civil] prosecution of civil proceedings are the following: (1) a civil proceeding was instituted or continued against the plaintiff; (2) the civil proceeding was instituted or continued by or at the insistence of the defendant; (3) the defendant acted with malice; (4) the defendant did not have probable cause for the proceeding or the underlying suit; (5) the proceeding was terminated in plaintiff's favor; and (6) the plaintiff suffered special injury as a result of the proceeding.

Besides an ordinary civil lawsuit, the following types of civil proceedings can support a claim for malicious prosecution: involuntary commitment and temporary guardianship proceedings; involuntary bankruptcy proceedings; and administrative proceedings.

"Malice" is defined as ill will, evil motive, or such gross indifference or reckless disregard for the rights of others as to amount to a willful or wanton act.

In malicious civil prosecution cases, there is an initial presumption that the defendant acted reasonably and in good faith and therefore had probable cause. The presumption disappears once the plaintiff produces evidence that the motives, grounds, beliefs, and evidence the defendant acted on did not amount to probable cause to commence or continue the proceedings. Once the plaintiff overcomes the presumption, the defendant must offer independent proof of probable cause.

"Probable cause" is defined as "[T]he existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts or circumstances within his knowledge at the time the proceeding was commenced, that the commencement of the proceeding was proper."

"Termination in plaintiff's favor" requires the plaintiff to establish that the civil proceeding was terminated in the plaintiff's favor. The plaintiff must show that a final judgment was rendered in the underlying suit and that all appeals were exhausted. The voluntary termination of the underlying suit does not satisfy the favorable-termination element; however, the withdrawal or abandonment of a proceeding may be evidence of a favorable-termination.

A plaintiff suffers "special injury" when there has been physical interference with the plaintiff's person or property, such as arrest, attachment, injunction, or sequestration.

The defendant can assert the defenses of good faith and absolute immunity to a claim for malicious civil prosecution. Because there is a presumption that the defendant was reasonable in bringing suit [administrative proceedings], and brought it in good faith, the defendant does not need to raise the defense of good faith and offer other evidence to support it unless the plaintiff overcomes the presumption. Here, the defendant has claimed that the plaintiffs have not overcome the presumption that defendant acted in bad faith. When a defendant testifies at trial, no civil liability for malicious prosecution may arise from that testimony. Here, the defendant has claimed that she is immune from civil liability based on her testimony in the underlying divorce proceedings, resulting in a restraining order and subsequent protective order.

3

## QUESTION NO 1.

Did Vanessa Velez Labrado engage in malicious civil prosecution against Leith Labrado when she initiated or continued administrative proceedings with Texas Child Protective Services and the Texas Health and Human Services Daycare Licensing Board?

Answer "Yes" or "No."

Answer: __YES__

If you answered "Yes" to Question 1, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO 2.

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Leith Labrado for damages, if any, proximately caused by such malicious prosecution?

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of the instructions in or your answers to any other questions about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

1.  Reputation damages.

    Answer: __Ø__

2.  Mental anguish damages.

    Answer: __$250,000__

4

2466

## QUESTION NO 3.

Laboe

Did Vanessa Velez Labrado engage in malicious civil prosecution against ~~Leith~~ Labrado when she initiated or continued administrative proceedings with Texas Child Protective Services and the Texas Health and Human Services Daycare Licensing Board?

Answer "Yes" or "No."

Answer: ___YES___

If you answered "Yes" to Question 3, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO 4.

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Laboe Labrado for damages, if any, proximately caused by such malicious prosecution?

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of the instructions in or your answers to any other questions about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

1. Reputation damages.

   Answer: ___0___

2. Mental anguish damages.

   Answer: ___$25,000___

5

2467

**QUESTION NO 5.**

Did Vanessa Velez Labrado engage in malicious civil prosecution against Three R's School, LLC., when she initiated or continued administrative proceedings with the Texas Health and Human Services Daycare Licensing Board?

Answer "Yes" or "No."

Answer: ___NO___

If you answered "Yes" to Question 5, then answer the following question. Otherwise, do not answer the following question.


**QUESTION NO 6.**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Three R's School, LLC for damages, if any, proximately caused by such malicious prosecution?

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of the instructions in or your answers to any other questions about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

1.  Defense damages.

    Answer: _____

6

## II.

"Abuse of Process" is defined as the improper use of process after its issuance—that is, the use of validly issued process for a purpose other than that for which it was designed.

The elements of a cause of action for abuse of process are the following: (1) the plaintiff was served with valid process; (2) the defendant made an illegal, improper, or perverted use of the process after it was issued; (3) the defendant had an ulterior motive or purpose in using the process; and (4) the plaintiff suffered injury as a result of the improper use.

"Process" is defined as any writ, summons, mandate or other judicial procedure used to inform a defendant of the beginning of judicial proceedings against him and to compel his appearance in court. The process originally served must have been valid, regular, and properly issued.

The mere issuance of process is not actionable as an abuse of process; there must be some use of the process that is improper. Process is used improperly when it is used (1) to accomplish some end other than its lawfully intended purpose, and (2) to compel a party to do some collateral thing that it would not otherwise be compelled to do. The improper use must be a use not authorized by the process, and it usually takes the form of coercion to obtain advantage in a matter not involved in the proceeding itself.

In most cases, ulterior motive is inferred from the improper purpose; for example, when the process is used to seize property that is not subject to the writ.

To prove injury, the plaintiff must show wrongful seizure of property or actual interference with the plaintiff's person. The relationship between the injury and the improper use is usually obvious because the injury is the immediate and direct consequence of the improper use.

A defendant can assert the defense of immunity to a claim for abuse of process. The law recognizes a person acting in good faith who (1) reports child abuse or neglect, (2) assists in the investigation of a report of alleged child abuse or neglect, or (3) testifies or participates in a judicial proceeding arising from a report or investigation of child abuse, is immune from civil or criminal liability that might otherwise be incurred or imposed for reporting child abuse.

7

2469

**QUESTION NO 7.**

Did Vanessa Velez Labrado commit abuse of process when she obtained the restraining order or subsequent protective order against Leith Labrado?

Answer "Yes" or "No."

Answer: ___YES___

If you answered "Yes" to Question 7, then answer the following question. Otherwise, do not answer the following question.

**QUESTION NO 8.**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Leith Labrado for damages, if any, proximately caused by such abuse of process?

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of the instructions in or your answers to any other questions about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

1.    Actual damages.

      Answer: $ 500,000

8

2470

**QUESTION NO 9.**

Did Vanessa Velez Labrado commit abuse of process when she obtained the protective order against Laboe Labrado?

Answer "Yes" or "No."

Answer: __YES__

If you answered "Yes" to Question 9, then answer the following question. Otherwise, do not answer the following question.

**QUESTION NO 10.**

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Laboe Labrado for damages, if any, proximately caused by such abuse of process?

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of the instructions in or your answers to any other questions about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

1.  Actual damages.

    Answer: $ __25,000__

9

## III.

The elements of an action for tortious interference with an existing contract are the following: (1) the plaintiff had a valid contract; (2) the defendant willfully and intentionally interfered with the contract; (3) the interference proximately caused the plaintiff's injury; and the plaintiff incurred actual damage or loss.

Interference with a contract is tortious only if it is intentional. The intent required is the intent to interfere. Intentional interference requires only that the defendant wants to cause the consequences of its act or that the consequences are substantially certain to result from the act.

As part of the proximate-cause element, the plaintiff must prove the defendant took an active part in persuading the party to breach its contract. The plaintiff also must establish the interference caused actual damage or loss.

A defendant can assert the defense of immunity to a claim for tortious interference with existing contract. The law recognizes a person acting in good faith who (1) reports child abuse or neglect, (2) assists in the investigation of a report of alleged child abuse or neglect, or (3) testifies or participates in a judicial proceeding arising from a report or investigation of child abuse, is immune from civil or criminal liability that might otherwise be incurred or imposed for reporting child abuse.

10

2472

**QUESTION NO 11.**



Did Vanessa Velez Labrado intentionally interfere with Three R's School, LLC's daycare contracts?

Answer "Yes" or "No."

Answer: __N O__

If you answered "Yes" to Question 11, then answer the following question. Otherwise, do not answer the following question.


**QUESTION NO 12.**



What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Three R's School, LLC for damages, if any, proximately caused by such tortious interference with existing contracts?

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of the instructions in or your answers to any other questions about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

1. Damages for loss of contractual profit.

   Answer: _____

11

2473

Answer the following question regarding Vanessa Velez Labrado only if you **unanimously** answered "Yes" to Questions 1, 3, 5, 7, 9, or 11 regarding Vanessa Velez Labrado. Otherwise, do not answer the following question regarding Vanessa Velez Labrado.



Exemplary damages may be awarded only if the plaintiff proves by clear and convincing evidence that the harm resulted from the specific circumstances pled.

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

"Clear and convincing" means the measure of the degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.



In order for you to find exemplary damages, your answer to Questions 1, 3, 5, 7, 9, or 11 regarding the amount of such damages must be unanimous.



## QUESTION NO 13.

What sum of money, if any, if paid now in cash, should be assessed against Vanessa Velez Labrado and awarded to Leith Labrado as exemplary damages, if any, for the conduct found in response to Question 1 or Question 7?

Factors to consider in awarding exemplary damages, if any, are -

1.      The nature of the wrong.

2.      The character of the conduct involved.

3.      The degree of culpability of Vanessa Velez Labrado.

4.      The situation and sensibilities of the parties concerned.

5.      The extent to which such conduct offends a public sense of justice and propriety.

Answer in dollars and cents, if any.

Answer:  0

12

2474

**QUESTION NO 14.**



What sum of money, if any, if paid now in cash, should be assessed against Vanessa Velez Labrado and awarded to Laboe Labrado as exemplary damages, if any, for the conduct found in response to Question 3 or Question 9?

Factors to consider in awarding exemplary damages, if any, are -

1.     The nature of the wrong.

2.     The character of the conduct involved.

3.     The degree of culpability of Vanessa Velez Labrado.

4.     The situation and sensibilities of the parties concerned.

5.     The extent to which such conduct offends a public sense of justice and propriety.

Answer in dollars and cents, if any.

Answer: ___0___

13

2475

**QUESTION NO 15.**

What sum of money, if any, if paid now in cash, should be assessed against Vanessa Velez Labrado and awarded to Three R's School as exemplary damages, if any, for the conduct found in response to Question 5 or Question 11?

Factors to consider in awarding exemplary damages, if any, are -

1.      The nature of the wrong.

2.      The character of the conduct involved.

3.      The degree of culpability of Vanessa Velez Labrado.

4.      The situation and sensibilities of the parties concerned.

5.      The extent to which such conduct offends a public sense of justice and propriety.

Answer in dollars and cents, if any.

Answer: ¢ _____

14

2476

## Presiding Juror:

When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

The presiding juror has these duties:

a.    have the complete charge read aloud if it will be helpful to your deliberations;

b.    preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

c.    give written questions or comments to the bailiff who will give them to the judge;

d.    write down the answers you agree on;

e.    get the signatures for the verdict certificate; and

f.    notify the bailiff that you have reached a verdict.

## Instructions for Signing the Verdict Certificate:

1.  Unless otherwise instructed you may answer the questions on a vote of ten jurors.  The same ten jurors must agree on every answer in the charge.  This means you may not have one group of ten jurors agree on one answer and a different group of ten jurors agree on another answer.

2.  If ten jurors agree on every answer, those ten jurors sign the verdict.  If eleven jurors agree on every answer, those eleven jurors sign the verdict.  If all twelve of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3.  All jurors should deliberate on every question.  You may end up with all twelve of you agreeing on some answers, while only ten or eleven of you agree on other answers.  But when you sign the verdict, only those ten who agree on every answer will sign the verdict.

SIGNED this **2nd** day of February, 2024.

_____
Judge Selena N. Solis

15

# VERDICT CERTIFICATE

Check one:

_____ Our verdict is unanimous. All twelve of us have agreed to each and every answer. The presiding juror has signed the certificate for all twelve of us.

_____          _____
Signature of Presiding Juror                          Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

___✓___ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

| | SIGNATURE | NAME PRINTED |
|---|---|---|
| 1. | | Ana L. Garcia |
| 2. | | Clarisse S. Rodriguez |
| 3. | | Sonia Salazar |
| 4. | | ARMANDO TOVAR |
| 5. | | RENE MAESE CASTELLANOS |
| 6. | | Javier Garcia |
| 7. | | SCOTT ALLEN BIDNICK |
| 8. | | OSCAR R. KING |
| 9. | | SID A. EDGAR |
| 10. | | Ana Maria Delgado |
| 11. | | |

16

2478

Filed 4/11/2024 1:38 PM  au
Norma Favela Ba~~~~ au
District Clerk
El Paso County
2021DCV3955

IN THE DISTRICT COURT OF EL PASO COUNTY, TEXAS
243rd JUDICIAL DISTRICT COURT

LEITH LABRADO, LABOE LABRADO  §
and THREE R'S SCHOOL, LLC,  §
  §
  §
*Plaintiffs*  §
  §
  §  Cause 2021DCV3955
v.  §
  §
  §
VANESSA VELEZ LABRADO,  §
  §
*Defendant*  §

## JUDGMENT

On January 26, 2024, this above-entitled and numbered cause was called to trial. Plaintiffs, LEITH LABRADO, LABOE LABRADO, and THREE R'S SCHOOL, LLC, appeared with their attorney of record and announced ready for trial. Defendant, VANESSA VELEZ LABRADO appeared with her attorney of record and announced ready for trial.

After a jury was impaneled and sworn, it heard the evidence and arguments of counsel. In response to the jury charge, the jury made findings that the Court received, filed and entered of record. The questions submitted to the jury and jury's findings are attached as Exhibit "A" and incorporated by reference.

All matters in controversy, legal and factual, were submitted to the Court for its determination. The Court heard the evidence and arguments of counsel and announced its decision and enters the following:

The jury found damages for LEITH LABRADO in the amount of $750,000. The prejudgment interest is calculated from the date of filing suit on November 9, 2021 until the date of the signing of the judgment April 11, 2024 (884 days) at the current post-judgment rate of 8.5%.

2585

The total amount of the prejudgment interest is $154,390.60 (yearly rate of $63,750 and daily rate of $174.65 -calculated by dividing the yearly rate of $63,750 by 365 days and then multiplying it by the 884 days). Therefore, judgment is entered for LEITH LABRADO against VANESSA VELEZ LABRADO in the amount of $904,390.60 along with an award for taxable court costs and post judgment interest at a rate of 8.5% beginning on the date of the signing of the judgment until the judgment is paid in full.

The jury found damages for LABOE LABRADO in the amount of $50,000. The prejudgment interest is calculated from the date of filing suit on November 9, 2021 until the date of the signing of the judgment April 11, 2024 (884 days) at the current post-judgment rate of 8.5%. The total amount of the prejudgment interest is $10,289.76 (yearly rate of $4,250 and daily rate of $11.64 -calculated by dividing the yearly rate of $4,250 by 365 days and then multiplying it by the 884 days). Therefore, judgment is entered for LABOE LABRADO against VANESSA VELEZ LABRADO in the amount of $60,289.76 along with an award for taxable court costs and post judgment interest at a rate of 8.5% beginning on the date of the signing of the judgment until the judgment is paid in full.

Accordingly, the Court order that Plaintiff LEITH LABRADO recover the following from Defendant VANESSA VELEZ LABRADO:

a.    $904,390.60;

b.    taxable court costs; and

d.    Post-judgment interest on all of the above at the rate of 8.5% as permitted and calculated by law from the date this Judgment is entered until all amounts are paid in full.

Accordingly, the Court order that Plaintiff LABOE LABRADO recover the following from Defendant VANESSA VELEZ LABRADO:

a.      $60,289.76;

b.      taxable court costs; and

d.      Post-judgment interest on all of the above at the rate of 8.5% as permitted and calculated by law from the date this Judgment is entered until all amounts are paid in full.

All writs and processes for enforcement and collection of this Judgment and the costs of court may issue as necessary.

All relief requested which is not expressly granted is denied.

This judgment finally disposes of all claims and all parties and is appealable.

SIGNED on ____, April 2024.

_____
Honorable Selena N. Solis

APPROVED AS TO FORM:

_____
Troy C. Brown
Laura Enriquez
Attorney for Plaintiffs

_____
Doris A. Sipes
Attorney for Defendant

2587

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Terry Castillo on behalf of Rachel Moreno
Bar No. 24078321
tschoemer@kempsmith.com
Envelope ID: 93782578
Filing Code Description: Brief Not Requesting Oral Argument
Filing Description: Appellant's Brief
Status as of 11/1/2024 11:38 AM MST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Terry Castillo | | tschoemer@kempsmith.com | 10/31/2024 9:42:27 AM | SENT |
| Rachel Moreno | | Rachel.Moreno@kempsmith.com | 10/31/2024 9:42:27 AM | SENT |
| Troy Brown | | troy@tcblegal.com | 10/31/2024 9:42:27 AM | SENT |
| Laura Enriquez | | enriquez@leeplaw.com | 10/31/2024 9:42:27 AM | SENT |